IN THE MATTER OF J.J.P.



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:IN THE MATTER OF J.J.P.

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 IN THE MATTER OF J.J.P.
2018 OK CIV APP 5
408 P.3d 218
Case Number: 115944
Decided: 12/01/2017
Mandate Issued: 01/03/2018
DIVISION III
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION III
Cite as: 2018 OK CIV APP 5, 408 P.3d 218

 

In the Matter of J.J.P. and J.L.P., Deprived Children:

ERIKA PRUIETT, Appellant,
v.
THE STATE OF OKLAHOMA, Appellee.

APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY, OKLAHOMA

HONORABLE LYDIA Y. GREEN, JUDGE

AFFIRMED

Bill Parker, Oklahoma City, Oklahoma, for Mother/Appellant,

Ambika Nagasandra, Assistant District Attorney, Oklahoma County, Oklahoma City, Oklahoma, for The State of Oklahoma/Appellee,

Jennifer Douglas, Assistant Public Defender, Oklahoma County, Oklahoma City, Oklahoma, for the Minor Children/Appellee.

Bay Mitchell, Presiding Judge:

¶1 Appellant Erika Pruiett ("Mother"), the natural mother of minor children J.J.P., d.o.b. 10/12/2011, and J.L.P., d.o.b. 11/13/2012, (collectively "the Minor Children" or "Children"), appeals the judgment terminating her parental rights following a multi-day jury trial. Because our review of the record demonstrated the State proved its termination case with clear and convincing evidence, we AFFIRM the judgment of the trial court.

PROCEDURAL AND FACTUAL BACKGROUND

¶2 Both of the Minor Children were removed from Mother's home in December 2012 when J.L.P., then approximately one-month old, suffered severe injuries.[1] The investigation into these injuries did not reveal who injured the child, but Mother and officials from law enforcement and the Department of Human Services ("DHS") suspected it was Mother's boyfriend at the time. A referral had previously been made to DHS at the time of J.L.P.'s birth due to Mother's statements that she felt like she might harm the child. Mother was later diagnosed with postpartum depression. Following a jury trial, both Children were adjudicated deprived by order entered September 3, 2014. Specifically, the order provided the Children were adjudicated based upon the lack of proper parental care and guardianship, physical abuse, and Mother's mental health. The jury declined to terminate Mother's parental rights at that time.

¶3 Following the deprived adjudication, Mother entered into an Individualized Service Plan ("ISP") on October 10, 2014. Mother worked through her plan which included parenting classes and other skills building programs. Mother progressed from supervised visitation, to unsupervised visitation, including extended overnight visits, and eventually to trial reunification which started June 9, 2016. During trial reunification, Mother reported to the permanency planning caseworker, Shelley Hughes, that the Minor Children were jumping on one of their twin beds when the bed slats broke and J.L.P. fell through the slats and hit his face. The fall left a scratch on J.L.P.'s face. This incident occurred sometime in mid-July 2016. During this same period of time, Mother underwent a tonsillectomy. The State's case highlighted Mother's apparent inability to make appropriate plans for the Children during her recovery from surgery. DHS offered to put the Children in respite care with the foster parents they had been with prior to trial reunification, but Mother declined. She told DHS that her sister and father could help with childcare, but neither family member was able to take time off work to help. Testimony was disputed as to whether DHS made it known to Mother that other options to help with childcare may have been available to her during her recovery including daycare. Mother was not employed at this time, so she did not believe DHS subsidized daycare was available to her.

¶4 Shortly after the bed incident, Ms. Hughes took J.L.P. to an appointment with his physical therapist where the therapist reported to Ms. Hughes that J.L.P. disclosed that he got the scratch on his face because Mother hit him with her cell phone.[2] Following that disclosure, Ms. Hughes took J.L.P. to The Children's Hospital in Oklahoma City where a pediatric child abuse specialist, Dr. Ryan Brown, examined him. When Dr. Brown asked J.L.P. how he got the scratch, J.L.P. again disclosed that Mother hit him with her cell phone and used Dr. Brown's cell phone to demonstrate. Dr. Brown's physical examination of J.L.P. also revealed that J.L.P. had bruising on the fleshiest part of his buttocks which Dr. Brown testified was consistent with the child being spanked beyond normal discipline. Following his examination, Dr. Brown drafted a memo to DHS which stated he thought the scratch on J.L.P.'s face and bruising to his buttocks were the results of child abuse. J.L.P. was returned to Mother's home, and both of the Minor Children remained in Mother's care at that time.

¶5 In response to Dr, Brown's referral, DHS sent a Child Protective Services ("CPS") caseworker, Jasmine Small, to check on both Children. Ms. Small testified at trial that her initial interaction with the family did not reveal any concerns or show that the Minor Children were threatened with immediate harm. DHS did not remove the Children at that time but scheduled forensic interviews. At that point, Mallory Hulsey took over the investigation. Ms. Hulsey was of the opinion that J.L.P's injuries could not have been caused by falling through the bed slats. Ms. Hulsey testified that J.L.P. revealed during his forensic interview that Mother used a brown belt to hit the siblings. She also testified that J.L.P. used profanity not normally used by such young children to describe Mother's disciplinary actions against the siblings. J.L.P. made consistent disclosures to the children's therapist and Ms. Hughes using the same profanity. During his forensic interview, the older sibling, J.J.P., also made similar disclosures using the same profane language and specifically mentioned the brown belt. Following the disclosures by the Children, DHS changed its goal for the family from reunification to termination. On September 20, 2016, the State filed its Third Amended Petition where it sought to terminate Mother's parental rights to both Children based on 10A O.S. Supp. 2015 §§ 1-4-904(B)(5) (failure to correct conditions) and (B)(10) (subsequent abuse). Specifically, the State alleged Mother failed to correct the conditions of lack of appropriate parental care and guardianship, physical abuse, and Mother's mental health.

¶6 In addition to the evidence and testimony discussed above, the Children's therapist, Shar'dae Lewis, also testified that both Minor Children made consistent disclosures of physical abuse at the hands of Mother or her father (their grandfather) and also expressed that they were afraid of Mother. Ms. Lewis testified that J.L.P. cried when he made his disclosures and that J.J.P. described being spanked repeatedly. J.J.P. would throw objects and pound his fists while he made these disclosures to Ms. Lewis.

¶7 During the course of this case, the trial court also appointed two guardians ad litem ("GAL") to represent the best interests of the Minor Children. At trial one GAL, LeAnne Burnett, testified about her interactions with the Children. Based upon her interactions with the Children and her understanding of their extreme reluctance to continue visitations with Mother after the bed incident and the disclosures of abuse by Mother, Ms. Burnett filed a motion with the trial court to suspend Mother's supervised visitations until a decision was reached on Mother's parental rights. She specifically recounted one instance where she went to visit the Children at the foster parents' home. Previously, all of her visitations with the Minor Children had been at Mother's house. When she arrived at the foster parents' home, J.L.P. greeted her with a statement that he did not want to go to Mother's house. While acknowledging the progress Mother had made on her ISP, Ms. Burnett testified that she thought it was in the Children's best interests if Mother's parental rights were terminated.

¶8 For her part, Mother denied ever physically disciplining the Minor Children but did admit to threatening them with "whoopings." She testified that the scratch on J.L.P.'s face and the bruise on his buttocks came from the fall through the bed slats. She also denied that she knew of or allowed her father to spank the Children. Mother testified to all the progress she had made on her ISP and her desire to have her children returned to her. Mother also recounted her history with mental illness. Specifically, Mother stated she had been diagnosed with depression as a teenager and began receiving Social Security disability benefits. Both she and her therapist testified that she consistently attended her therapy sessions and that she was continuing to make progress on dealing with the daily stress of life. Mother also testified that she saw a nurse practitioner at Planned Parenthood after the Children were removed from trial reunification. The nurse prescribed an anti-depressant to help her deal with that situation, but, with the approval of the nurse, Mother stopped taking the medication because of the side effects. Mother's sister also testified on Mother's behalf and stated that she thought Mother did a good job with the Children but also admitted that she lived in north Texas and was not around them daily.

¶9 Following the submission of all the evidence to the jury, the jury terminated Mother's rights based on 10A O.S. Supp. 2015 §§ 1-4-904(B)(5) (failure to correct conditions) and (B)(10) (subsequent abuse). Specifically, the jury found Mother failed to correct the conditions of lack of appropriate parental care and guardianship, physical abuse, and Mother's mental health. Mother appeals the jury's verdict arguing that the State failed to prove its case by clear and convincing evidence.

STANDARD OF REVIEW

¶10 In parental termination cases, the State must show by clear and convincing evidence that the child's best interest is served by the termination of parental rights. In the Matter of C.G., 1981 OK 131, ¶17, 637 P.2d 66, 70--71. "Clear and convincing evidence" is the measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established. In the Matter of the Adoption of L.D.S., 2006 OK 80, ¶11, 155 P.3d 1, 4 (quoting In re C.G., 1981 OK 131, n. 12). This standard of proof "balances the parents' fundamental freedom from family disruption with the state's duty to protect children within its borders." Id. In like manner, our review on appeal must find the presence of clear and convincing evidence to support the trial court's decision. In the Matter of S.B.C., 2002 OK 83, ¶7, 64 P.3d 1080, 1082. Appellate courts must canvass the record to determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. Id. at ¶6.

¶11 The joint brief submitted by the State and the Minor Children points out that Mother's attorney did not challenge the sufficiency of the State's evidence at trial and contends Mother has thus failed to preserve that issue for appellate review. Drouillard v. Jensen Const. Co. of Okla., Inc., 1979 OK 126, ¶5, 601 P.2d 92, 93 (stating the general rule that, in a jury trial, appellate review is secured by moving for a directed verdict at the close of all the evidence and before the issues are submitted to the jury). That general rule will not apply here because of the fundamental and constitutionally protected parental rights of which the State seeks to deprive Mother.[3] We will not be limited in our review of the evidence by Mother's failure to challenge the sufficiency of that evidence at trial. Further, given our Supreme Court's unequivocal instructions to apply the clear and convincing standard of review, Mother's procedural lapse will not overcome Mother's request for meaningful appellate review. In re S.B.C., 2002 OK 83, ¶7 ("[A]ppellate review of a parental-bond severance must be conducted by searching for the presence of clear-and-convincing proof.").

ANALYSIS

¶12 Mother's sole argument on appeal is that the State failed to prove by clear and convincing evidence that the statutory grounds for termination were met. Specifically, as to the allegations that Mother failed to correct conditions of lack of appropriate parental care and guardianship and physical abuse, 10A O.S. Supp. 2015 § 1-4-904 (B)(5), Mother argues that the State relied solely on the disclosures by the Minor Children to support termination and that such statements were not sufficient. Similarly, because the State's case that the Children suffered subsequent abuse, id. at § 1-4-904(B)(10), was supported by the same evidence, Mother argues the State did not meet its burden. As to the allegation Mother failed to correct the condition of her mental health, id. at § 1-4-904(B)(5), she argued the State never put forth any evidence about her mental health diagnosis or that she was not complying with the treatment thereof.

¶13 We agree with Mother that the State failed to prove with clear and convincing evidence that she failed to correct the condition related to the treatment of her mental health. The State did not provide any evidence of Mother's diagnosis or that she was not complying with the treatment protocols or otherwise not complying with the ISP. Both Mother and her therapist testified that she was consistent in going to therapy. The only testimony related to prescription treatment for Mother's mental health was that Mother sought out treatment after the trial reunification ended and that she stopped taking the drugs, with the nurse's approval, because of the side effects. Such evidence is insufficient to terminate Mother's parental rights for failure to correct the condition of her mental health.

¶14 However, we disagree with Mother's description of the majority of the State's case as being solely supported by the unreliable statements of young children. While the Minor Children in this case made the initial disclosures of abuse, the State presented testimony from multiple sources substantiating the Children's claims, including but not limited to the pediatric child abuse specialist, Dr. Brown, the DHS permanency worker, Ms. Hughes, the DHS investigator who investigated the Children's claims, Ms. Hulsey, along with the Children's therapist, Ms. Lewis, who testified to the continuing, consistent disclosures made by the Children. The Children's GAL, Ms. Burnett, also testified about her interactions with the Children and her belief that termination was in their best interests. While Mother denied the allegations of abuse, no explanation was ever given as to how the Children could have given consistent, continuing disclosures which used similar profane language and described the same type of abuse. Evidence presented by the State overwhelmed any explanation or evidence presented by Mother.

¶15 Because we find the State proved with clear and convincing evidence that Mother failed to correct the condition of lack of proper parental care and guardianship and physical abuse and that the Minor Children suffered subsequent abuse, the judgment of the trial court terminating Mother's parental rights is AFFIRMED.

BUETTNER, C.J., and SWINTON, J., concur.

FOOTNOTES

[1] The jury for the termination proceeding was not made aware of the details of J.L.P.'s injuries, but the record showed the child was admitted to the hospital with two subdural hematomas, an occipital skull fracture, retinal hemorrhaging, three separate fractures to his legs, and brain injuries consistent with being choked. These injuries had lasting effects on J.L.P.'s health. He was diagnosed with cerebral palsy and required occupational and physical therapy.

[2] J.L.P. actually stated that "Erika" hit him with the phone. Testimony was consistent at trial that both Minor Children referred to Mother as "Erika" instead of "mom" or other similar title.

[3] The termination of a right so fundamental dictates an application of the full array of procedural safeguards. Matter of Chad S., 1978 OK 94, ¶12, 580 P.2d 983, 985; Matter of A.M. and R.W., 2000 OK 82, ¶8, 13 P.3d 484, 487. Because of the fundamental right which parents have in the custody of their children and the gravity of the sanction imposed by termination, there is no substitute to fully complying with all procedural safeguards.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 2002 OK 83, 64 P.3d 1080, IN THE MATTER OF S.B.C.
Discussed at Length
 2006 OK 80, 155 P.3d 1, IN THE MATTER OF THE ADOPTION OF L.D.S.
Discussed
 1978 OK 94, 580 P.2d 983, MATTER OF CHAD S.
Discussed
 1979 OK 126, 601 P.2d 92, DROUILLARD v. JENSEN CONST. CO. OF OK
Discussed
 1981 OK 131, 637 P.2d 66, C. G., Matter of
Discussed at Length
 2000 OK 82, 13 P.3d 484, 71 OBJ 2668, IN THE MATTER OF A.M. & R.W.
Discussed


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA